Case number 165743, Joel Naselroad v. Dennis Mabry, et al. Or arguments for 15 minutes for plaintiff, 15 minutes to be shared by the defendants. Trevor Wells for the appellant. May it please the court, my name is Trevor Wells and I'm here today on behalf of Joe Naselroad who appeals from a summary judgment entered by the Eastern District of Kentucky for the defendants in a 1983 case. With the court's permission, I'd like to reserve two minutes of my time for rebuttal. There are a number of issues in this case and they've actually sort of proliferated after the appellees filed their briefs and cited additional grounds to buttress the district court's decision. However, my plan, subject to revision at any time if the court has questions, is to focus on the bases upon which the Eastern District of Kentucky thought summary judgment was warranted for the defendants. And I'm going to focus on the warrantless entry claim as well as the excessive force claim. Turning to the warrantless entry claim... I have a preliminary question with regard to that. Yes, Your Honor. He was convicted, right, on a marijuana charge. Correct. Was that conviction based on the marijuana which was recovered from the property which you claim was unconstitutionally entered? Was the marijuana found elsewhere, Your Honor? There was a paraphernalia charge, so there may have been some in the house. Why is there not a Heckfieh-Humphrey problem with regard to that claim? Okay, I'm processing that question. I mean, if we were to find that in fact the entry was unconstitutional, violated the Fourth Amendment, and that which was seized, therefore, violated the Fourth Amendment, we would be undermining the conviction, would we not? Let me back up and say, I think there's a factual matter that would help answer the question. And that is that after all of these events, they backed off and got a warrant. And the evidence that was ultimately seized was seized in relation to a warrant. So there's a different factual set of circumstances that resulted in the seizure of the evidence. And there was no effort to suppress anything which was obtained as a result of the warrant. There wasn't a claim that you wouldn't have even gotten the warrant, but for having been on there improperly in the first place. I don't believe that there was a fruit-of-the-poison's-tree argument made in that litigation, Your Honor. That record's not in this record, but I can't answer that directly, but I believe that's correct, Your Honor. Thank you. So framing the issue, this is a warrantless search, I mean, a warrantless entry. So it's presumptively unreasonable. And, you know, to configure the qualified immunity analysis, therefore, the defendants have to rely on an exception to the warrant requirement. And the nature of the burden of proof means that it would be protected by qualified immunity unless it would be unreasonable for any officer to believe that there was an exigent circumstance that would permit them to enter the curtilage area here. There are a couple problems from the Eastern District of Kentucky's analysis. One legal, one more factual, I guess. But the primary problem is that at the time of this entry, there's no probable cause at all. Probable cause is a probability, given the totality of the circumstances, that you'll find contraband at the location identified. And there's a very good reason that this is a knock-and-talk investigation rather than a warrant execution. And that's that my daughter's boyfriend says she saw weed on the property, does not a warrant application make in any circumstance. That never reaches anything resembling probable cause. Now, my brief describes this as sort of a paradigmatic summary judgment issue because the problem for the Eastern District of Kentucky is that it makes an error regarding a disputed fact or fails to appreciate that there is a disputed fact. Instead of drawing all inferences in favor of the non-moving party, what the court ends up doing is basing its decision on inferences pro-defendant that it's drawing from disputed facts. And in particular, those are the facts in regard to whether Mr. Nasal Road was in the property, was inside the home and then left after the initiation of the knock-and-talk. Clear dispute of fact on the record. The Court of Appeals just... Here's my question. I've struggled with it because you make a good argument. But in thinking about how this whole event occurred, I was wondering if there is not a way to view the statements of the various parties in a way that does not create a dispute. The officers are at the door. You have a marked and a uniformed officer, and they're speaking to Mr. Nasal Road's mother. Craycraft says he sees Nasal Road go by and go out the door. Nasal Road says, I didn't hear them talking to the police officer. I was just going outside on what I had told my mother earlier I was going to do to investigate this person who was photographed on my property. Help me understand why that doesn't make a difference in this case because the question is what a reasonable officer in Craycraft's position would have reasonably perceived. Let's say Mr. Nasal Road did not see him at the door, but Craycraft saw Nasal Road, and he's talking to the mother about the drugs, and he sees Nasal Road go behind her and go out the back door. Maybe no eyes met. I know the case law about eyes meeting. No eyes met, and he goes outside. Why was it unreasonable in that circumstance for Craycraft to think, I'm standing up here talking to his mother. I'm complaining about this report of marijuana, and I'm seeing him leaving. I think he's going outside to destroy this marijuana because isn't that the reasonably objective inference, reasonably objective conclusion made by the officer standing at the door. Why is that a disputed issue of fact? Don't we have two different perceptions going on, even if we accept both of their statements about what they were thinking? I think the court has formulated the legal analysis correctly. I do not believe that in light of all of the evidence, that the evidence is able to be as squared and dovetailed and viewed from different perceptions as the court is arguing. Jeannie Nasal Road's testimony says when she comes out of the bathroom to get to the door that he's gone. I think accepting that testimony makes it impossible to square a version of the events where Craycraft sees what Craycraft says he sees. Okay. So her testimony is not that he was no longer where I was. Her testimony would be that he has left the home? I believe that's correct, Your Honor. It's cited in the footnote in the factual section, and I'll look at it when I sit down here in a second, but that's my recollection as to what that testimony is. Because if that's not the case, wouldn't we be asking what the officer standing at the door would think of what he observed? I think you could ask that, Your Honor. And I think even if you give them that, I don't think you've got a probable cause. The naked statement. But you have exigent circumstances. No, no, you can't have exigent circumstances unless you have probable cause to believe there's marijuana in the first place. You can't have a belief that if there's a probability that somebody's going to destroy marijuana that you don't have a probable cause to believe exists. Even in light of whether it is reasonable or not for the officer standing at the door to think that Mr. Nasalroad has overheard what has gone on and is now taking action based on what the officer concludes he has overheard. Give them tip, give them Craycraft's version of events. I'm not sure it adds up to probable cause. But the second part of that is definitely an issue of disputed facts. So I don't think we get there. But I think the court could spot them both, tip and Craycraft's interpretation of the events of the scene, you still don't have probable cause to believe the exigent circumstance exists. Turning to the excessive force issue. Like most of these cases, how the court draws the goalposts, the level of abstraction at which you examine qualified immunity, clearly established right analysis, ultimately drives the train here. This isn't a novel factual circumstance where Trooper Mabry had no clear constitutional parameters. Case law from this jurisdiction holds that a previous decision in a factually identical case isn't required. The general reasoning of circuit level decisions are sufficient. And in the Sixth Circuit decision, BOUGESS, B-O-U-G-G-E-S-S, which I think I threw an extra R in in my brief, indicates mere possession of a weapon is not enough. When a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm, deadly force is not justified. But you had more than just a weapon here, didn't you? You had the person with the weapon facing the police officer and then attempting to put a bullet in the weapon. Isn't that a little bit more than just having a weapon? Not evidence that was in Trooper Mabry's estimation of time. There's a disputed issue of factors as to whether he attempted to rack a bullet into the weapon. None of that matters from Trooper Mabry's perspective because he wasn't there when that allegedly happened. But what did Trooper Mabry have? Trooper Mabry had, I'll give what the most is and then we'll try to whittle it down. Trooper Mabry had defendant with gun in low ready position. What did Mabry have before that? He had gun, gun. He had the gun warning. He's not hearing what's going on. He's sitting in the patrol car or his truck, I guess. Outside his truck, taking his boots off or something. All right, so he sees his fellow officers go to the door. He sees someone open the door and speak to them. So he's going, knock and talk is going on. That's the point at which he knew it was a knock and talk. When he got to the property, he didn't even know it was a knock and talk. So now he knows it's knock and talk and he hears Craycraft say he's running out the back. He's going out the back or he's running out the back. He hears that stuff. So he then immediately runs to the back. Help me understand what is unreasonable in his perception and responsive action. Are we talking about the unlawful entry or are we talking about the excessive force? Just to make sure I understand the question. Work your way through both of them because what we're doing is we're sitting in Mabry's position. We know the police car is there. We know the uniformed officer is there. We know the knock and talk has gone on. He hears the man standing at the knock and talk say he's running out back. And I think Ms. Nasalroad even said that she heard something along that line. So there is confirmation of that. I don't think that's a disputed issue if that statement was said. He takes action at that point to go out back where he has been directed. He hears gun, gun. Ms. Nasalroad hears gun, gun. So tell me what, from the reasonable perspective of that officer, barred him from taking the action he did. I'll talk about the unlawful entry first. Trial court bases that entirely upon the same prevent imminent destruction of evidence analysis. So the above discussion applies there. There's not an exigency based on danger because in this circuit that requires not only proof of possession of a weapon but evidence of an intent to use the weapon, none of which was available to Mabry at the time he entered the property. Now the question of when Mabry shoots, I framed the issue at the beginning of the brief. The retreating individual, gun, low ready position, and then the other question out there is whether there's evidence from which a reasonable officer could perceive an intent to use the weapon because of the failure to drop it, which presents issues relating to the non-identification of the officers. But there is no disputed issue of fact that there was a drop the weapon command. Nasalroad's own testimony admits that Trooper Mabry came to the scene, said drop the weapon, drop the weapon, state police, and then Nasalroad said pew, that's when he heard the shot, before he had a chance to comply. Except that the record is that he had a chance to look from the officer that was, and it is short, there's no question about that, but isn't the record clear that Nasalroad had a chance to look both at Craycraft and then back again at Mabry when all of this was going on and that Nasalroad was on an upper hill angle? I think the pictures show that. He's in an elevated position. He was in an elevated position. The positioning of the gun is going to be an issue of fact, regardless of whether he's in an elevated position or not. But he admitted that he called it low ready. He called it low ready, and I understand my time's up, so if at any point you don't feel like I'm answering a question, you let me know. He called it low ready because there had been a criminal trial in this case, and he heard the word low ready a bunch of times. We're talking about his testimony. I'm sorry? We're talking about his testimony. And he specifically clarifies that what he meant by low ready was that he had the gun pointed down. But in response to the earlier question as to whether there's a dispute in the evidence as to whether he looked from one to the other, I believe there is some testimony from someone on that question. I believe if you look at Mr. Nasalroad's own testimony about the amount of time he had to respond to Trooper Mabry's drop the gun command, it is unequivocal that he did not have time to respond to that before the bullet struck him. Okay, thank you. Thank you. Thank you. May it please the Court, Mr. Wells. My name is Barry Stills, and I'm representing Detective Mark Craycraft, Justin John Gurley, Sheriff Burrell Perdue. Mr. Cole is here with me as well as Mr. Mando. Mr. Cole represents Trooper Mabry, and Mr. Mando represents Officer Puckett. I'll take six minutes at your all's pleasure. This case involved a knock and talk. I'll go back and start on October 8, 2013. My client, Officer Craycraft, received a call from his sergeant, Paul Howard, with the Clark County, Kentucky Sheriff's Department, relaying to him a lady's complaint about a possible marijuana grow operation on the Nasalroad property in Clark County, Kentucky. What Mr. Craycraft did, Mr. Craycraft is a Deputy Sheriff with Clark County, but he's also attached to a unit of the Kentucky State Police called the DESI Force, which I believe stands for Drug Enforcement Special Investigations. He called the lady that gave the information, Betsy Spangler. She gave her name, specified to Deputy Craycraft that she or her boyfriend had been hunting and had hit a deer on their property and chased it over into the Nasalroad property, as deer hunters do. I don't deer hunt. I'm not going to profess to know how far they go to track their prey. But he said, and he was in the room at the time, the testimony from Ms. Spangler is, when she was talking to Officer Craycraft that he had seen three marijuana plants growing on the Nasalroad property. At that point in time, Mr. Craycraft assembles a DESI team, and they take one uniformed officer, Mr. Gurley, and a uniformed marked cruiser to do a knock and talk. Admittedly, Mr. Craycraft, Mr. Mayberry, and Mr. Puckett were plainclothes. They did have badges. The bottom line is that they chose the knock and talk because they didn't have probable cause to get the warrant? I believe that they did have probable cause. From that tip? Yes, ma'am. I think that's more than sufficient in some of these cases. A tip coming from somebody who says somebody else told her that there were three marijuana plants growing on the property? This was a tip not just from a paid informant. This was a tip from a citizen who gave her name and had somebody call her back. This isn't something that she knew. This is something someone else told her. That's correct. Somebody else knew really nothing about either one of these people. They had nothing on which to base reliability for those people. Just a tip. It's a tip, but I believe case law here stands that a tip is sufficient. It is. I believe it's the United States v. Johnson. I'm sorry. Yes, it was a tip. They chose a knock and talk with Mr. Craycraft and Mr. Puckett in uniform going to the house. The big issue here, and the appellant makes a big ... I thought you just told us that there were ... How many of them were plainclothes? There were three plainclothesmen, one uniformed police officer in a marked unit. Mr. Gurley was the uniformed police officer, and it was his marked unit. He and Mr. Craycraft went to the door to do the knock and talk. Mr. Mayberry and Mr. Puckett stayed back in the driveway. Door opens. The testimony is, in a fair reading of it, when you take Ms. Naslerode's deposition and her son's deposition, is that although he says it's clear that Joel Naslerode had left the residence, it's anything but. At best, it's, I don't know where they were. I don't know where Joel was. Joel doesn't know who his mother was talking to at the door. She was interviewed by two Kentucky State police officers, she being Judy Naslerode, after the shooting. In her deposition, she was confronted with these statements where she made these statements saying he was in the house at the time the knock came on the door. That was in that meeting afterwards, but then was confirmed in sworn deposition testimony? Is that your position? My position is it was confronted with her, and she affirmed that testimony in her deposition. That was her statement. I know he makes a statement that it was unsworn, but it was sworn testimony. She was confronted with it, and she not only identified her voice on the tape, she said, yes, that's what I said. On several different occasions, she says that. Yes, with regard to my client, I'm running way out of time here, I'm sorry. With regard to my client, facts have to be viewed, obviously, from a standpoint of what a reasonable officer would have done in his situation in a light most favorable to the plaintiff. Even in a light most favorable to the plaintiff, it's at best a mere possibility, and I believe the Gregg case and several other cases cited by the district court there say that that doesn't raise a sufficient factual dispute to avoid summary judgment. For those reasons, Your Honors, we believe that the district court properly upheld, and for the reasons that we have stated in our brief, we believe that the district court properly ruled that my client was entitled to qualified immunity. The plaintiff did not show that there was no clearly established right that was violated, as is required under associated versus cast analysis. Thank you. Thank you. May it please the Court, Mr. Wells, Mr. Stills, Mr. Mando, my name is Charles Cole, and I'm here on behalf of Trooper Dennis Mabry. What we argued to the district court, and what I will argue today, is the qualified immunity defense of Trooper Mabry, and that's been touched upon by the court. What did he hear? What did he see? What was his officer's perspective? And what he heard, again, some of it's been touched on, some of it's not. He didn't know this was a knock and talk until this team was assembled, and then he learns en route that it's going to be a knock and talk. Once he gets to, he knew it was a marijuana pool initially. Once he gets to the home, he is the second car in line, and the first car is a marked cruiser, and the photographs are in the record. That marked cruiser is parked very near the door, within clear eyesight. A uniformed officer and Mr. Craycraft, Officer Craycraft, get out of the car and go to the door. As Your Honor said, that's what he saw. Now he's at his truck, and he's putting on his muck boots, preparing to pull marijuana, and then it is, what is he hearing? The first thing he hears, and I think Plaintiff's Counsel has agreed with the facts as they were stated up here, he hears, you're going out the back. What does he do then? He puts on his boots, and he walks, he's still in the public area, the driveway, and he walks over to the father's woodshed. At that point in time, what does he hear? He hears the word, gun, gun. That's all been stipulated to, it's clear in the record. Those two things are things that are coming from other officers, and questions today have been asked, well, what is your seminal case? Well, the cases are Humphrey v. Mabry, interestingly the same name, that officers can rely upon the statements of other officers. Does that arise in the context of there already existing probable cause to be at that location? Well, I'm arguing under the qualified immunity standpoint. So for his entry onto the property, there are these verbal keys that he's hearing. So his entry onto the property, I'm arguing, is once he's not on the property until he hears the word gun, and that is more than just gun. When it's gun, gun, that is a police officer in his mind signaling out, someone has pulled a gun, there's an emergency going on, there is a gun, and he's entitled to rely upon that. What does he do at that point in time? Then he goes around the back of the building and enters the rear of the property and sees Mr. Nasal Road with a gun in hand in what's always been said a low ready position. What happened before that, the facts in the record are, is that he pointed the gun at Officer Craycraft. So he pointed it at Craycraft, because that's in the record. You pointed it at Craycraft, and he confirms that. Officer Mabry was not there at that point, but the gun is out. It's not something in his holster, it's already been pointed. Then what does he do? He says he maintains it in a low ready position. To a reasonable police officer, low ready means something. That means it can be fired at any time. Then the court has already mentioned he's in an uphill position, Craycraft below, Mabry above. What does he do? I ask him the question. So you turned toward him, swung your gun towards Mabry. No, I kept it. Turned my body towards him and kept my gun down. At the first time when he said drop the gun, you heard him say something and turned your body. Yes. Then, did you ever look back towards Sheriff Craycraft? Yeah, I was looking up and down the hill, just realizing this is a person in the yard that yelled at me is not the same person that is up above the hill. So he has got a gun in his hand in a low ready position. He's turning his body, admittedly, to look at Mabry. Does not drop the gun. He turns back to size up the situation and looks back downhill towards Craycraft. This is showing a threat of serious physical injury. He's got a gun in his hand, and he's turning back and forth. So Mabry is lawfully on the property. He's come because of a call for assistance, gun, gun. He's got a gun, and he's now seeing someone with the gun, not in other cases where it's been set on the ground like a rifle and picked up. You don't shoot somebody with a rifle holding it this way, but a gun in your hand, you can shoot someone. And he's not dropping the gun, and admittedly, he hears police yelled. Now, he says that was right about the time he was shot. But again, in Officer Mabry's perspective, it's the timing of this, and all the indicators were there to him that Nasal Road knew it was the police. You had a marked cruiser very near the door where they did the knock and talk. You had a uniformed officer. He saw both of these at the door. You have a holler, and this is the mother, a holler. She admits a holler of going around back. He hears that, and that's the first time he takes any move. And then he sees a gun that is drawn. And I think it's also interesting, you know, there's this word, hey, buddy, that's in there. Well, if he hears, hey, buddy, that's not a threatening statement. What does he do after he hears, hey, buddy? He immediately draws his weapon. So all of these are indicators, going out the back of the house, doing these things that Mr. Nasal Road was doing, along with the other officer's statements. These are all indicators that a reasonable officer such as Dennis Mabry was sitting there hearing this and saying my assistance is required. I'm not going to stay here at my car. I am going to go around and investigate first by hearing you're going out the back and still remaining in the driveway and then not entering the property until this call for help of gun is rendered. And for those reasons, I think his entry on the property was justified based upon the risk of danger. And we argue that his use of force was appropriate because there was a threat of serious physical harm. If there are no questions, I will conclude my remarks. There are not.  Thank you, Your Honor. Thank you. Returning to Judge Strantz's question about the Jeanne Nasal Road testimony, it's footnote three on page 25 of our brief is where we've synopsized this testimony. And what Mr. Stills describes is part of that discussion. She says she doesn't know exactly when he leaves, and we have a citation for that. She also then says he wasn't there when I came out of the bathroom and answered the door. And there's a citation for that testimony, too. I don't have the capacity to pull it up and pull the full context, but it's my understanding that is not in the house as opposed to just not in some location there at the door. While I'm talking about testimony, Mr. Cole's description of Mr. Nasal Road having the time to look back and forth is accurate. And I think he's accurate to say that that's Mr. Nasal Road's testimony. The missing context is that the dispositive question in there is, at what point was the person barking the commands identifying him or herself as law enforcement? And Mr. Nasal Road's- It's a Raycraft question. No, no, no. Is it a Mabry question? It's a Mabry question, I think. And because here's what Nasal Road said. Nasal Road said he never heard anything about police until an instance before he shot. Page 35 of our brief, first full paragraph, and you heard him say he was state police. Drop the gun. Boom, instantaneously. You heard him say that twice? No. He said, drop the gun, drop the gun, drop the gun, state police. And when he said it the third time, he added the state police. And I'm like, what? And I was already on the ground. Well, the second he said it, he pulled the trigger. Yes, I still had it in my hand. There was no chance to put the weapon down. That is the basis for our contention that no inference of intent to use the weapon can be drawn from the drop the weapon, his failure to comply with drop the weapon commands, from people who had no reason to believe were law enforcement at that time. Help us understand how you evaluate this from Mabry's position and from what he understood. There's no testimony. Well, it's a contested issue of fact whether anybody said state police. So from Mabry's perspective, it's not reasonable until the nanosecond of the trigger was pulled. So from Trooper Mabry's perspective, it's not reasonable, not objectively reasonable to draw an inference of the necessary substantial risk of serious physical injury, which is the sort of floor of what you have to have in order to use deadly physical force. Unless from the failure to drop, to the extent that is a variable, he cannot reasonably draw that inference in a vacuum where there is no authority behind the order to drop the pistol. That's our position. Thank you, Your Honors. Thank you, Counsel. The case will be submitted. The court will take a brief recess.